No. 16,268.

WOODRUFF, ADMINISTRATRIX, *v.* BOWEN.

MUNICIPAL CORPORATION.—*City.—Owner of Building in.—Duty to Keep in Safe Condition.—Firemen.—License.*—The owner of a building in a populous city does not owe it as a duty at common law, independent of any statute or ordinance, to keep such building safe for firemen or other officers who, in a contingency, may enter the same under a license conferred by law; but such duty may be imposed either by statute or by ordinance.

SAME.—*City Ordinance.—Construction of.—Firemen.—Dangerous Buildings and Structures.—Liability of Owner.—Damages.*—Where a city ordinance declares that "It shall be unlawful for any person to construct, erect or maintain any unsafe, insecure and dangerous wall, building, or structure within the limits of this city, and it shall be the duty of all persons owning premises upon which there is any dangerous, unsafe and insecure wall or building to make the same safe and secure, either by properly repairing the same or by rebuilding the same within twelve hours after receiving notice from the chief fire engineer," etc., and declaring what walls, buildings, and structures shall be deemed unsafe, such ordinance has reference to walls and buildings in immediate danger of falling or in immediate danger of taking fire, and the evident purpose of the ordinance was to protect the city against fire, and to protect the citizens and those whose business required them to be in the vicinity of such walls and buildings, and could not have been intended for the safety of firemen, if, in response to their duty, they are called to such building or structure, to extinguish a conflagration.

SAME.—*City.—Ordinance.—Safety of Buildings.—Firemen.—Personal Injury.—Liability.—Damages.*—Where, in the absence of any statutory requirements, but under the ordinance as above set out, a person has erected a building which, under ordinary circumstances, was reasonably safe for the purposes of commerce and trade, and it becomes unsafe only by reason of the fact that it was stored with a large quantity of goods, by a tenant, and by reason of the additional fact that in an extraordinary emergency by fire, large quantities of water were thrown into and upon the building and goods, thereby causing it to collapse, whereby firemen in the discharge of their duty were killed, the owner of such building is not responsible in damages for the death of the firemen who were on the premises under a license conferred by law only.

LICENSE.—*Duty of Licensor to Licensee.—Liability.*—A licensor owes

to a mere licensee no duty except that of abstaining from any positive wrongful act which may result in injury to the licensee, and the licensee takes all risks as to the safe condition of the premises upon which he enters.

From the Marion Circuit Court.

*Henry N. Spaan* and *W. A. Ketcham,* for appellant.

*D. W. Howe, J. S. Duncan, C. W. Smith* and *L. Howland,* for appellee.

Coffey, J.—This was an action in the Marion Circuit Court, brought by the appellant against the appellee, for actionable negligence resulting in the death of the appellant's decedent. The suit was brought for the benefit of the widow and children of the deceased. The complaint is in two paragraphs, to each of which the court sustained a demurrer. This ruling of the circuit court is assigned here as error.

The able counsel for the appellant has prepared a synopsis of the complaint, the correctness of which is not disputed by the appellee, and for that reason we adopt it as a correct statement of the contents of the complaint. It is as follows:

The first paragraph alleges, that the decedent, Henry D. Woodruff, was in the employ of the city of Indianapolis as a fireman, and, as such, belonged to the organization known as the fire department of the city, which, in turn, was composed of a body of men duly appointed and acting under a code of rules, whose duty it was to put out any and all fires occurring within the limits of the city, the apparatus therefor being furnished by the city, and the compensation to the firemen and the cost of the apparatus being paid out of the city treasury; that as such fireman, the deceased and his comrades were bound, whenever the alarm of fire was sounded, to attend and do all in their power to put out the fire, and while so doing were under the direction of the officers of

the fire department; that on the 17th of March, 1890, a fire broke out in a building owned by the defendant, situate on Washington street, and deceased, with other firemen, in response to the alarm, went to the building to put it out.

In attempting to do so, under the control and command of the chief of the fire department and his assistants, in the discharge of his duties as fireman, and under the orders of the officers of the fire department, he had gone upon the roof of the building, and while there, in the course of his employment, it being a proper place for him to be at the time when the accident occurred, and while he believed, and had reason to believe, that it was reasonably safe for him to be on the roof in company with the other firemen, the roof and other portions of the building, without warning, gave way and precipitated the deceased and eleven other firemen into the basement of the building midst the falling and burning debris of the roof, which caused the death of the deceased and his eleven comrades; and he was killed without any fault or negligence on his part, but because of the negligence of the defendant, as follows:

The defendant, for a long time prior to the 17th of March, had been a resident of the city, had owned the building, and, in common with other citizens of the city, enjoyed the benefits and protection afforded by the fire department. At the time, and for a long time before that, he knew, and had known, that it was the duty of the deceased and his comrades to respond to alarms of fire, and to attempt to put out any fire that might break out in his building. The building was situate in the business center of the city, and in its most frequented portion, and defendant knew that it was in constant danger of catching fire, either by accident or design.

The defendant, as a resident of the city, and as a constituent part of this government, and as entitled to the protection of the fire department, invited the decedent and his comrades, in their capacity as firemen, into and onto the building. That at some time prior to the fire, the defendant, as the owner of the building, had leased the same to the Bowen-Merrill Company, who were in possession at the time of the fire, under the lease, but long before then, and before the execution of the lease, the defendant had changed, enlarged, and repaired his building; but when he built it, and at the time of the accident, it had a substantial appearing iron front, and the deceased believed, and had reason to believe, that the building was as substantial as it appeared; but, in fact, it was a remodeled building made much larger and higher than it was originally, and, when defendant remodeled and rebuilt it, he did not increase the strength of the foundation walls, and the whole building, back of the imposing iron front thereon, was insufficiently built and insecure, while having the outward appearance of strength to the deceased and others whose duty called them to the same.

During the time while the building was being occupied by the Bowen-Merrill Company, as a tenant of the defendant, the defendant was the president and chief executive officer of the company, and owned $35,000 out of the total capital of $80,000, and, during the entire continuance of the lease, the right was conceded to him by the company to come upon the premises and to make thereon such improvements and repairs as he might deem necessary for the protection and preservation of the building.

That in remodeling the building it was built unsafely; the walls not strong enough, the foundation not sufficient to meet the exigencies and requirements for which

the building was intended and used; that defendant knew when he leased the building that the company would place, and did place, in it a stock of stationery, books, etc., and he also knew that the building was not strong enough to bear the weight of such stock. He also knew at the time when he executed the lease, and at the time when the deceased was killed, that the building was not strong enough, and was so insecurely built that it would not stand the weight of the stock, and that any additional strain that might be put upon it in case of fire by the weight of the water which would be thrown upon the stock to put out the fire, and at the time of the fire the weight of the stock and the weight of the water, because of the weak and insufficient character of the building and foundation walls, gave way; that the building was so weak, insecure and unsafe as to be dangerous to all who might go about it in case any additional weight might be placed upon the same, as in case of fire.

At the time of the death of the deceased, defendant was receiving rent for the building; deceased did not know of the unsafe and negligent construction and condition of the building at and before it fell; and deceased left a widow and four children under nineteen years of age.

The second paragraph thereof states substantially the same facts as the first, with the following additions:

The building was thirty-five (35) feet in front and one hundred and twenty (120) in depth; it had been on fire several times during the last ten years, and to secure himself from loss by fire at the time of the occurrence of the fire, and for a long time before that, defendant had carried twelve thousand dollars ($12,000) fire insurance on the building; and on the 28th of April, 1873, the city of Indianapolis passed an ordinance in which it was provided, among other things: "It shall be unlawful for any person to construct, erect or main-

tain any unsafe, insecure and dangerous wall, building, or structure within the limits of this city, and it shall be the duty of all persons owning premises upon which there is any dangerous, unsafe and insecure wall or building to make the same safe and secure, either by properly repairing the same or by rebuilding the same within twelve (12) hours after receiving notice from the chief fire engineer, * * * each and every day in which such wall or building is permitted to remain unsafe, dangerous and insecure after the receipt of notice as herein provided shall be held and taken as a separate and distinct violation of this ordinance, and as such punished. * * *

"Sec. 6. Any wall, structure, or building likely to fall or to take fire shall be taken and deemed to be unsafe and insecure within the meaning of this ordinance. All brick walls less than one foot in thickness, and which form a part, or are intended to form part, of a building more than two stories in height, shall be deemed unsafe and insecure."

This ordinance was in force from its passage, until after the fire, and deceased, in his lifetime, and the defendant, knew that it was in force.

When the defendant became the owner of the premises, they were occupied by two store rooms, two stories in height, with walls on either side, and a continuous wall in the center contributed to the support of the roof and floors sufficiently to support the building in its then condition. After defendant became the owner, and after the building had been in existence for over forty years, as originally built, the defendant, being desirous of increasing the capacity and area of his premises without materially increasing the expense, added two stories to the two stories then existing, taking out the center wall above the basement, without strengthening or add-

ing to the capacity of strength of the east and west walls, or without adding anything to the foundation under the center walls, and supporting the new building, thus erected, in the center with iron and wooden pillars, upon which, in connection with the side and end walls, the floors of the second and third stories rested, and by which they were all supported. By the manner of construction, the smaller weight before had been distributed throughout the entire length of the foundation of the center wall, but was very greatly increased by the additional size and weight of the building, and by the substitution of columns for a solid wall, the added weight, instead of being distributed along the entire length as it had been theretofore, was concentrated upon a few spots upon which the pillars rested, thus producing an unequal pressure at these places, and diminishing the bearing strength of the foundation upon which the pillars rested. In making this improvement, the defendant took away the original front wall which indicated to the observer the character of the building, and substituted a substantial, strong, and imposing iron front for the entire height of the four stories, and thus gave to the building, which was in fact weak and insufficient to bear any great weight, the appearance of being a sound, substantial and permanent improvement, capable of sustaining not only the building and its contents, but of being safe in case of fire or other accident which would cause unusual weight to be borne by the building. It was known to the defendant at the time of the fire, that the building and its walls, more especially the foundation under the center columns, were unsafe, insecure and dangerous, and likely to fall and take fire, but that was not known to, but was concealed from, the deceased and the officers of the fire department, and they were prevented from ascertaining the defective, insufficient, in-

secure, unsafe and dangerous character of the foundation, because of the fact that it was underneath the floor, and not to be seen by any one entering the premises in the ordinary course of business, and the deceased and the officers of the fire department were thrown off their guard, and prevented from ascertaining the condition of the building, walls, and foundation by the outward appearance of strength and sufficiency given to it by the iron front, and ever since the remodeling, rebuilding and enlargement of the building upon his premises, the defendant had continued to maintain it in the unsafe, insecure and dangerous manner named, contrary to the provisions of the ordinance, well knowing that with any extra weight, as in case of any accident or in case of fire, it would be insufficient to stand the strain, and so fall.

When the fire broke out in the building, water was thrown upon the stock in order to put out the fire, and the weight of the stock, together with the weight of the water, and the unsafe, insufficient, insecure and dangerous character of the building, walls, and especially the foundation walls, caused it to give way without being weakened or impaired at all in their bearing strength by the fire which was burning.

It is contended by the appellant:

*First.* That the owner of a building in the heart of a populous city owes it as a duty at common law, independent of any statute or municipal ordinance, to keep such building safe for purposes other than the requirements of trade and commerce; that such duty is comprehensive enough to embrace the safety of firemen and other officers whose duty, in the event of a contingency, may require them to be in and about the building, and that the complaint in this case shows a breach of this duty on the part of the appellee resulting, proximately, in the death of the appellant's decedent.

*Secondly.* That it appears from the allegations in the complaint, that the appellee maintained the building, therein described, in violation of the ordinance of the city of Indianapolis, therein set out, the immediate result of which was the death of the appellant's decedent, and that he is, for that reason, liable for the resulting damages.

On the other hand, it is contended by the appellee, Bowen:

*First.* That whether he is to be regarded as the owner or occupant of the building described in the complaint, the decedent entered it as a mere licensee, and that he was not guilty of any actionable breach of duty to him.

*Secondly.* That whether he be regarded as the owner or occupant of such building, and whether he be deemed to have invited the decedent to enter the building, he was not guilty of any actionable breach of duty to him.

*Thirdly.* That he was not guilty of any actionable breach of duty to the decedent, imposed by any municipal ordinance.

*Fourthly.* That the negligence set up in the complaint was not the proximate cause of the death of the appellant's decedent.

*Fifthly.* That the building described in the complaint, being in the exclusive possession of the appellee's tenant, the decedent can not be deemed to have entered by his invitation or license, and hence he is not liable.

It is conceded that the decedent, at the time of his death, was lawfully in the appellee's building. It is important, however, to determine whether he was there under an invitation from the appellee, either express or implied, or whether he was there as a mere licensee.

This is important for the reason that the appellee would owe him a much higher duty, if he was there by invitation, than he would owe him if he entered under

no other authority than that of a license.  It is true the complaint alleges that the appellant, ''as a resident of the city, and as a constituent part of this government, and as entitled to the protection of the fire department, invited the decedent and his comrades, in their capacity as firemen, into and onto the building,'' but we do not understand this allegation as intended to convey the idea that any personal or express invitation was given.

The pleader evidently intended, we think, to charge that there existed a general implied invitation from the citizens of the city, including the appellee, to the firemen belonging to the fire department to enter their houses in case of a conflagration, for the purpose of extinguishing the fire.  This allegation, therefore, does not enable us to determine whether the deceased was in the house of the appellee by invitation or as a licensee.

Judge Cooley, in his valuable work on torts, divides licenses into three classes.

Of the third class he says:  ''The third class of licenses comprehends those cases in which the law gives permission to enter a man's premises.  This permission has no necessary connection with the owner's interest, and is always given on public grounds.  An instance is where a fire breaks out in a city.  Here the public authorities, and some private individuals, may enter upon adjacent premises as they may find it necessary or convenient in their efforts to extinguish or avert the spread of the flames.  The law of overruling necessity licenses this, and will not suffer the owner of a lot to stand at its borders and exclude those who would use his premises as vantage ground in staying the conflagration.  Indeed, it sometimes becomes necessary to destroy whole blocks of buildings to stop the spread of fire and the sufferer, instead of looking to the officials who command it or the parties who execute their commands, must seek

Woodruff, Administratrix, *v.* Bowen.

redress at the hands of the State itself and accept what the State awards." Cooley on Torts (2d ed.), p. 367.

We think Judge Cooley, in the above extract, states the law correctly. It does not appear from the complaint before us, that the deceased. entered the house of the appellee, where he lost his life, by invitation either express or implied, but it does appear that he entered under a license given by law for the purpose of extinguishing a fire raging therein at the time. It is unnecessary, under this state of facts, to inquire what duty the appellee would have owed the deceased, had he entered the building under an invitation, or to inquire whether the premises were in the sole possession of a tenant of the appellee, as the case must turn upon the duty which the appellee owed the deceased at the time he entered under a license given by the law.

We do not believe it can be successfully maintained that the appellee owed to the deceased, who entered his premises under a license created by an overruling necessity, a higher duty than if he had entered under an express license granted by him.

In the case of *Reardon* v. *Thompson*, 149 Mass. 267, it was said: "No doubt a bare licensee has some rights. The landowner can not shoot him." He can not lawfully set spring traps for him. The licenser is liable, even to a licensee, if he is guilty of what the civil law termed "*dolus.*" But beyond this the licenser owes the licensee no duty, certainly not the duty of active diligence to see that no harm comes to him, and when the latter, without any invitation, and pursuant to a mere license, enters the former's premises, he takes the risk of whatever dangers may be there. The law is so laid down in the text-books, and is established by a multitude of decisions.

Mr. Pollock, in his Work on Torts, p. 426, says: "In

the language of continental jurisprudence, there is no question of *culpa* between a gratuitous licensee and the licensor, as regards the safe condition of the property to which the license applies. Nothing short of *dolus* will make the licensor liable.''

To substantially the same effect are, Charles Ray, Negligence, 23; *Parker v. Portland Publishing Co.*, 69 Me. 173; *Pittsburgh, etc., R. W. Co.* v. *Bingham*, 29 Ohio St. 369; *Larmore* v. *Crown Point Iron Co.*, 101 N. Y. 391; *Victory* v. *Baker*, 67 N. Y. 366; *Thiele* v. *McManus*, 3 Ind. App. 132, 28 N. E. Rep. 327; *Lary* v. *Cleveland, etc., R. R. Co.*, 78 Ind. 323; *Evansville, etc., R. R. Co.* v. *Griffin*, 100 Ind. 221; *City of Indianapolis* v. *Emmelman*, 108 Ind. 530; *Indiana, etc., R. W. Co.* v. *Barnhart*, 115 Ind. 399.

The question of the liability of the property owner to a mere licensee was very recently fully considered by this court in the case of *Faris* v. *Hoberg*, 134 Ind. 269, 33 N. E. Rep. 1028.

In that case, after a careful review of the authorities, the conclusion was reached that one entering a store, on his own private business, by a way not used by customers, was a mere licensee, and that the owner of the store owed him no duty. We think that the authorities fully establish the rule that the licenser owes to the mere licensee no duty except that of abstaining from any positive wrongful act which may result in his injury, and that the licensee takes all risks as to the safe condition of the premises upon which he enters.

To the question now under discussion, decisions based upon express statutes or ordinances, as well as decisions based upon the fact that the injured party entered the premises under an invitation, express or implied, are not applicable.

We are of the opinion that the owner of a building in

a populous city does not owe it as a duty at common law, independent of any statute or ordinance, to keep such building safe for firemen or other officers, who, in a contingency, may enter the same under a license conferred by law. It seems to be settled, however, that such duty may be imposed either by statute or by an ordinance adopted for that purpose. *Willy* v. *Mulledy*, 78 N. Y. 310; *Parker* v. *Barnard*, 135 Mass. 116; *Ryan* v. *Thompson*, 6 Jones & Spencer, 133; *Luddington* v. *Miller*, 4 Jones & Spencer, 1.

It remains, therefore, to inquire whether the appellee is liable for the injury of which complaint is made, by reason of the ordinance of the city of Indianapolis, set out in the complaint.

In the case of *Willy* v. *Mulledy, supra,* a statute provided that the owners of a designated class of buildings in the city of Brooklyn should provide the same with fire-escapes. It was held that this statute was intended for the benefit of tenants, and the owner of a building of the class named who failed to comply with the statute, was liable to a tenant who was injured by reason of such failure.

In the case of *Parker* v. *Barnard, supra,* there was a statute which provided that in any store or building in the city of Boston, in which there was placed a hoistway or elevator hole, such hoistway or elevator hole should be protected by a good and substantial railing, and good and sufficient trap doors, with which to close the same, and that the trap doors should be kept closed at all times except when in actual use by the occupant of the building. It was held that this statute was intended for the benefit of all persons lawfully entering such a building, and that for this reason a police officer who entered after night, in the discharge of his official duty, and was

injured by reason of a failure to comply with the statute, might recover, although he was a mere licensee.

In the case of *Reardon* v. *Thompson, supra,* there was an ordinance of the city of New York, similar to the statute mentioned in the case of *Parker* v. *Barnard,* and it was held that such ordinance was intended for the benefit of firemen, police officers and others, who, in the performance of their duties, might be called upon to enter such houses after night, and that a policemen injured by reason of a failure to comply with the ordinance might recover.

In the case of *Luddington* v. *Miller, supra,* a statute of the United States provided for private bonded warehouses. The statutes and the regulations of the treasury department placed such warehouses under the control and management of the warehousemen who owned the same, so far as the supervision and management of the hatchways were concerned. It was held that if such warehousemen negligently left open a hatchway in a passageway over which a custom officer would pass, in the discharge of his duties at such house, by reason of which the officer was injured, he might recover for such injury.

The ordinance under immediate consideration is fully set out in the complaint, a synopsis of which is above set forth. There is nothing in the ordinance to indicate that the common council, at the time it was adopted, had in mind the safety of firemen in case of a fire occurring in the city. It was evidently its purpose to protect the citizens and those whose business required them to be in the vicinity of walls and buildings liable to fall and do them injury, and also to protect the city against fire by reason of structures liable at any time to take fire. That the common council did not have in mind the kind of wall described in the complaint, is evidenced by the fact

that the ordinance in question requires the owner of any dangerous, unsafe or insecure wall or building to make the same safe and secure, either by properly repairing the same or by rebuilding the same within twelve hours after receiving notice from the chief fire engineer. Such provision, together with other provisions in the ordinance, indicate, we think, that the common council was legislating with reference to walls and buildings in immediate danger of falling, or in immediate danger of taking fire.

In this case, so far as it appears from the facts alleged in the complaint, the appellee had erected a building which, under ordinary circumstances, was reasonably safe for the purposes of commerce and trade. It became unsafe only by reason of the fact that it was stored with stationery, by a tenant, and by reason of the fact that in an extraordinary emergency large quantities of water were thrown into and upon the building, thus putting it to an extraordinary strain. We do not think the ordinance before us was intended to apply to a building of this character.

The appellee, in the construction of his building, was not, in our opinion, bound to anticipate extraordinary events, but if he constructed a building which was ordinarily safe under ordinary circumstances, he was not acting in violation of the terms of this ordinance.

This case has been ably argued orally, in open court, and briefed on both sides with unusual care and ability; and, after a careful consideration of all that has been said, and a careful examination of all the authorities cited, we have been forced to the conclusion that the complaint before us does not state facts sufficient to hold the appellee liable for the injury set up in the complaint, either under the common law or the ordinances of the city of Indianapolis.

It follows from this conclusion, that the circuit court did not err in its ruling, and that its judgment should be affirmed.

Judgment affirmed

Filed Oct. 20, 1893; petition for a rehearing overruled Jan. 11, 1894.